EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ABRAHAM VALENTÍN HERNÁNDEZ, acusado y apelante.

Núm. 7934.—*Sometido:* Enero 17, 1940. *Resuelto:* Enero 25, 1940.

---

* NOTA: Véase el prefacio.

*Abraham Valentín Hernández,* por su propio derecho; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

En el juicio que por tribunal de derecho se celebró en primera instancia en la Corte de Distrito de Mayagüez, el acusado fué convicto y sentenciado a la pena de un año de cárcel por un delito de libelo. La acusación en este caso formulada dice así:

"El Fiscal formula acusación contra Abraham Valentín Hernández por un delito de Libelo Infamatorio (*misdemeanor*), cometido de la manera siguiente:

"El referido acusado Abraham Valentín Hernández, allá por el día 20 de marzo de 1938, y en Mayagüez, P. R., que forma parte del Distrito Judicial de Mayagüez, P. R., ilegal, voluntaria y maliciosamente escribió, compuso y publicó y permitió que se publicase en 'El Nacionalista', un periódico semanal publicado en Mayagüez y de circulación general en el Distrito Judicial de Mayagüez, P. R., y concerniente a Blanton Winship quien era allí y entonces Gobernador de la Isla de Puerto Rico, cierto artículo falso y malicioso, conteniendo palabras y sentencias concernientes a dicho Blanton Winship, Gobernador de Puerto Rico, a saber:

"Las Fechorías de un Gobernador.

"No puede haber paz en Puerto Rico mientras exista la intervención, no habrá paz en Puerto Rico mientras Estados Unidos no respete la soberanía puertorriqueña y mucha menos paz existirá en Puerto Rico mientras Don Blanton el pirata, empañe con su presencia el lugar que ocuparon centenares de años personas de decencia en quienes era inherente el respeto a lo ajeno.

"Él ha sabido hacerse de una buena batería de corrales, donde conserva a sus anchas a un buen número de esclavos de quienes hasta avergonzados se sienten y con razón pueden sentirse los inocentes cochinitos que crían nuestros jíbaros y que diariamente son sacrificados para satisfacer el apetito de muchos seres de nuestra isla y también de muchos 'cerdos nativos' que desde hace tiempo están bajo la custudia y amparo de su gran padre, protector y amamantador Blanton Winship.

"Estos cerditos del burócrata de Santa Catalina hicieron una de sus primeras demostraciones allá para el 24 de octubre de 1935 cuando hastiados de que existiera valor y dignidad en nuestro pueblo, se propuso y mediante la intervención de sus bien disciplinados cerdos a que usaran los salones de nuestra Universidad para declarar 'Non Grato' en ella al Doctor Pedro Albizu Campos; él había de hacer esto dentro de su mayúscula brutalidad y sólo con su espíritu de bestia, ignorando que ya América había consagrado a Albizu como uno de sus más ilustres hijos; él había de hacer eso contra Albizu Campos porque ignoraba que el inmenso Vasconcelos en una hora de conversación que sostuviera con Albizu, él mismo (Vasconcelos) ha expresado que aprendió más que durante los años que permaneció en las Universidades; él había de hacer eso porque ignoraba que Don Juan Marinello a quien quizás Don Blanton no se atreva ni mirar cara a cara, había dicho de Albizu lo que no se han atrevido decir del Blanton Winship ninguno de sus disciplinados cerditos; él había de hacer eso porque ignoraba que lo que vale algo en nuestra América había consagrado al hombre más que como un graduado común como un genio; en fin, él había de hacer todo eso porque él no es puertorriqueño y en nada le conviene que siendo él 'el amo', mediante las prédicas del inmenso Albizu sus siervos fuesen a darse exacta cuenta de sus gatazos y fechorías y le fuesen a tildar tal y como yo lo estoy tildando desde la Matanza del 21 de marzo de 1937; en un bandido, en un asesino Verdad.

"Sí, fué el 24 de octubre de 1935 el escogido por el mandón de Santa Catalina para dar comienzo o sea poner la primera piedra al edificio de sus grandes fechorías; y sabiendo él que el mismo estudiantado iba a dar un alto a lo ya por él ordenado, fué que hizo uso de sus cerdos uniformados de azul para que asesinaran indefensos y apiñados dentro de un automóvil a cinco pacíficos puertorriqueños; pero habían de ser de esos cinco cuatro nacionalistas para que existiese el pretexto; eran nacionalistas e iban según la mira de defensa del ogro de Santa Catalina a matar unos cuantos de sus amaestrados

cerdos; ningún otro automóvil debía ser registrado ni sus pasajeros tiroteados; la orden de Don Blanton es: 'Acabar con todo el que no se someta a su voluntad.'

"Y con esta su primer maniobra y en unión ya de Riggs se apuntó su primer triunfo. SU PRIMER OBRA DE MATÓN.

"Ramón S. Pagán, Eduardo Rodríguez Vega, Pedro Quiñones, José Santiago Barea y Muñoz Jiménez. (Fdo.) Abraham Valentín Hernández, Mayagüez, P. R., marzo 20 de 1938."

"Dicho artículo y dicho periódico se acompañan a la presente acusación como parte de la misma y se marcan *Exhibit A.*

"Todas dichas manifestaciones contenidas en dicho artículo arriba mencionado, hechas y concernientes a Blanton Winship, son falsas, voluntarias y maliciosas, y el dicho Abraham Valentín Hernández sabía muy bien en época que él escribió, compuso y publicó dicho artículo o publicación, que todas las exposiciones antes dichas, hechas de y concernientes al dicho Blanton Winship y contenidas en dicho artículo o publicación antes expresado, son falsas y maliciosas, pero el dicho Abraham Valentín Hernández compuso, escribió y publicó dicho artículo o publicación conteniendo las exposiciones antes dichas, de y concernientes a Blanton Winship, Gobernador de Puerto Rico, y queriendo allí y entonces imputarle el hecho de ser un bandido, y de ser un asesino verdad y de ser el responsable de la matanza de 21 de marzo de 1937 (y se alega como *innuendo* que la matanza de 21 de marzo de 1937 a que se refiere dicho escrito se refiere a los 17 muertos habidos en Ponce en 21 de marzo de 1937 en un choque entre la policía y numerosos paisanos en cierto motín ocurrido en aquella ciudad ese día); dicha publicación y exposiciones antes dichas y concernientes a dicho Blanton Winship, Gobernador de Puerto Rico, fueron escritas, compuestas, publicadas y circuladas con el propósito perverso y malicioso y con la intención de perjudicar su buen nombre y buena fama como empleado público y gobernador de Puerto Rico y como ciudadano de esta comunidad, y exponerle a la sospecha, odio y desprecio público y pérdida de su reputación.

"Este hecho es contrario a la Ley para tal caso prevista y a la paz y dignidad de El Pueblo de Puerto Rico."

El acusado no ha radicado alegato en apoyo de su recurso y consecuentemente ha dejado de presentar el señalamiento de errores que exige el reglamento de este tribunal. Sólo ha presentado un escrito solicitando un nuevo juicio por haber

sele negado por la corte *a quo* el derecho que alega tener a ser juzgado por un jurado.

██ Conforme aparece del récord, al llamarse este caso a juicio oral y preguntarse a las partes si estaban listas para entrar en juicio, el acusado, dirigiéndose a la corte, se expresó en los siguientes términos:

"Acusado: En este caso se había solicitado mi caso por Tribunal de Derecho, porque yo tenía al Lic. Eudaldo Báez García por abogado, y como él se niega a hacerme la defensa, yo he decidido hacerme la defensa; pero yo hago una advertencia a la Corte, que se me diera algún tiempo para ser juzgado por jurado.

"Hon. Fiscal: El Fiscal se opone. Entiende el Fiscal que el acusado renunció a su juicio por jurado en el acto de la lectura de la acusación, y ahora pide que se juzgue por jurado, cuando ya los testigos han sido citados para este caso.

"Hon. Juez: En este caso la acusación contra usted se leyó el día 30 de junio de 1938. Usted, el acusado, por su abogado Eudaldo Báez García, solicitó que se le diera el término de sesenta días para contestar la acusación, y la corte, tomando en consideración que el día primero de julio subsiguiente entraba en vacaciones, no tuvo inconveniente en conceder un beneficio que nunca se concedió dentro de ley, dándole un término de sesenta días para contestar la acusación. A los sesenta y dos días, o sea el viernes 2 de diciembre de 1938, compareció usted y su abogado, haciendo la alegación de no culpable y solicitó juicio ante el tribunal de derecho, y la Corte ordenó que el caso fuera señalado oportunamente. Se señaló el caso para el día 14 de noviembre de 1938, y habiendo recibido el Fiscal del Distrito una orden del Hon. *Attorney General* de Puerto Rico para que inmediatamente se trasladara a practicar una investigación en el Banco de Economías y Préstamos de San Germán, se suspendió el caso, señalándolo entonces para el día de hoy. Entiende la Corte que aunque en un proceso de libelo el acusado tiene derecho a juicio por jurado, el acusado tuvo una espléndida oportunidad durante sesenta y dos días para contestar la acusación y solicitar juicio por jurado; y tuvo otros sesenta días aproximadamente desde el 14 de noviembre en que su caso se señaló para juicio y se suspendió hasta el día de hoy. Se han citado testigos de El Pueblo de Puerto Rico y hay gastos, porque hay testigos de San Juan, y el Fiscal se ha opuesto, porque si se suspendiera este caso para celebrarlo por jurado, el día del juicio tal vez usted podría renunciar al jurado y esto sería interrumpir los fines

de la justicia. Por tales razones, procede declarar sin lugar la petición del acusado.

"(Al acusado.) ¿Tiene usted alguna otra alegación que presentar a la Corte? Si el acusado quiere, la Corte puede nombrarle un abogado de oficio para que lo represente en la vista del caso.

"Acusado: En este caso yo renuncio a mi abogado de oficio.

"Hon. Juez: Entonces, Secretario, léale la denuncia." (T. de E., 2–4).

¿Erró la corte *a quo* al no conceder al apelante un juicio por jurado después de haber renunciado a ese derecho? La regla general en los Estados Unidos es al efecto de que las cortes de primera instancia tienen una amplia discreción para conceder o denegar el juicio por jurado después que el acusado ha renunciado a ese derecho. 16 R.C.L. 218. En Puerto Rico, la materia está regulada por el artículo 178 del Código de Enjuiciamiento Criminal, que dice así:

"Art. 178. Cuestiones de hecho en casos de delito grave (*felony*) y en casos de *misdemeanor* siempre que originalmente se presentare la acusación en la corte de distrito y fueren también de la competencia de las cortes municipales, habrán de ser juzgadas por el jurado, cuando el acusado o acusados o cualquiera de ellos, lo pidiere. Dicha elección deberá notificarse al tribunal cuando se haga la primera lectura de la lista que contenga la causa. Si se hiciere dicha elección, ésta se hará constar en el récord; si no se hiciere, se hará constar así en dicho récord, y se considerará que el derecho a ser juzgado por jurado ha prescrito y la causa será juzgada por el tribunal. Sin embargo, *si se alegan* (*se demuestran*, según la versión inglesa) *justas razones, el tribunal podrá conceder el juicio por jurado* en cualquier fecha subsiguiente a la lectura de la lista o relación de causas." (Paréntesis y bastardillas nuestras.)

Como cuestión de hecho las cortes de distrito no celebran lectura de calendario de causas criminales. Es al leérsele la acusación que el acusado elige o renuncia al juicio por jurado, y fué ése el procedimiento seguido en el presente caso. De acuerdo con el precepto anteriormente transcrito, si después de haber renunciado al juicio por jurado o haber prescrito el derecho a solicitarlo, el acusado demuestra a la corte que existen justas razones para que se le conceda juicio

por jurado, la corte *puede,* en cualquier momento después de la lectura de la acusación, ejercitar su discreción a favor del acusado. ¿Abusó de su discreción la corte *a quo* al denegar la petición del acusado? De la parte del récord anteriormente transcrita resulta que no fué hasta el preciso momento de empezar el juicio que el acusado formuló su petición. De acceder a ella, hubiera sido necesaria la suspensión del juicio, pues no aparece del récord que hubiera un jurado citado para aquel día, y una suspensión en tales condiciones significaba no solamente la consiguiente dilación en la administración de justicia, si que también todos los gastos que conlleva una suspensión y citación para nuevo juicio.

En el caso de *Staley* v. *State,* 79 P. (2d) 818, resuelto por la Corte de Apelaciones Criminales de Oklahoma el 20 de mayo de 1938, se sostuvo que un acusado no tiene el derecho de exigir un juicio por jurado después de haberlo renunciado, y que aunque en aquel caso ningún perjuicio se hubiera causado al Estado por hallarse en la corte un jurado que hubiera podido conocer del caso inmediatamente, sin embargo el no ejercitar la corte su discreción a favor del acusado no constituía error, puesto que como cuestión de derecho él no podía exigir ser juzgado por un jurado después de haber renunciado a ello.

En el caso de *State* v. *Bannock,* 53 Minn. 419, 421, 55 N. W. 558, 600, se trata la cuestión en la siguiente forma:

"Habiendo voluntariamente renunciado al derecho a juicio por jurado, el acusado no podía revocar su renuncia y exigir esa clase de juicio. Sería una inconsistencia decir que el derecho, después de haber sido expresa y efectivamente renunciado por el acusado, podía ser reclamado a su mera voluntad. El derecho a revocar de ese modo es inconsistente con la naturaleza esencial de una renuncia."

Es claro, pues, que la corte sentenciadora no cometió error alguno al ejercitar su discreción en este caso en el sentido de no suspender la vista del mismo para conceder al acusado el juicio por jurado a que anteriormente y de manera expresa y efectiva había renunciado.

Examinada la acusación en este caso formulada, de ella resulta claramente la exposición del delito de libelo imputado al acusado. De la prueba, que también hemos examinado, resulta que la materia libelosa fué publicada. Siendo ello así, no existe en este caso error fundamental alguno que justifique la revocación de la sentencia, ni la concesión del nuevo juicio que interesa el acusado.

*Procede, por lo expuesto, desestimar el recurso y confirmar la sentencia apelada.*