EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FLORENCIO RIVERA SUÁREZ, acusado y apelante.

Número: CR-66-304     Resuelto: 12 de mayo de 1967

*Edna Abruña Rodríguez, E. Armstrong de Watlington y Enrique Miranda Merced,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El apelante solicitó juicio por jurado. Luego de presentada la prueba de cargo y después de haber comenzado a desfilar la de la defensa, a través de su abogado pidió que se excusara al jurado y que el proceso se continuara por tribunal de derecho. El juez denegó el pedido. Se apunta esa negativa como error.

Antes de considerar esta cuestión, procede exponer los hechos. El apelante fue acusado de asesinato en primer grado. Fue convicto de homicidio. El 5 de enero de 1962, en las primeras horas de la noche, se encontraba un grupo de personas en la tienda del apelante, en el Barrio Salto del Municipio de Cidra. Entre éstas estaba un muchacho de trece años, la persona que resultó muerta de nombre Félix Báez Franco y dos individuos más. El muchacho y Félix Báez jugaban a los topos. En algún momento el dueño de la tienda manifestó que no quería que siguieran jugando. Félix Báez insistió en su derecho a jugar. Estando sentado en un banco Félix Báez, el dueño de la tienda tomó una tranca y le propinó tres trancazos. El primero por la cabeza que lo tiró al suelo. Otro más por la cabeza cuando trató de incorporarse y un tercero en el

cuerpo. Félix Báez golpeado regresó tarde a su casa. Por la mañana no pudo levantarse. Lo condujeron al Pueblo de Cidra y luego al Hospital de Río Piedras. Muere el 8 de enero siguiente. Según el testimonio del médico que practicó la autopsia el cadáver de Félix Báez "no manifestaba fractura ni a la base ni a la cavidad craneal" salvo la craneotomía practicada por el médico que lo atendió en el Hospital.

De la declaración de uno de los agentes que intervino en la investigación del caso surgió que originalmente el caso fue archivado como casual por el Juez de Paz de Cidra. A instancias de una hermana del occiso se practicó la investigación que dio margen a la acusación radicada contra el apelante. El agente fue extensamente interrogado en relación con la investigación que practicó. Surgió que no sabía dónde residía el acusado. Esto trajo que el juez que presidía la vista comentara: "Un detective que no sabe si el acusado vive o no vive en la misma tienda. Investiga un caso y no sabe donde vive el acusado. Eso es bochornoso . . . ." "Un detalle como ése aparentemente insignificante, pero es que todavía no sabe donde vive el acusado. Y más, este caso, que está lleno de nebulosidades. El interés mío es que salga la verdad. Yo no tengo el mismo interés que puedan tener las autoridades que investigan para conseguir el culpable . . . ." "Es horroroso que a estas horas todavía no se sepa donde vive el acusado. Si eso es una injusticia, si es eficiente, que le den una medalla." Luego de este incidente comenzó la prueba de la defensa. Declararon dos testigos. Anuncia que no tiene otros y que ése es el caso de la defensa. La defensa informa que renuncia al jurado y pide que el proceso continúe por el tribunal de derecho. El juez lo niega.

■ El derecho a juicio por jurado en Puerto Rico no tiene garantía constitucional hasta la promulgación de nuestra Constitución en el año 1952. (1) La Sec. 11 de la Carta de De-

---

(1) *Pueblo* v. *Campos*, 69 D.P.R. 898, 902 (1949) ; *Figueroa* v. *People of Puerto Rico*, 232 F.2d 615 (1st Cir. 1956).

rechos lo garantiza. Antes del año 1952, el Art. 178 del Código de Enjuiciamiento Criminal—34 L.P.R.A. sec. 462— ([2]) concedía ese derecho. Se requerían actos positivos de parte del acusado para que el juicio se celebrara ante el jurado. Tenía que pedirlo el acusado. *Pueblo* v. *Hernández*, 55 D.P.R. 954 (1940). Esta práctica estaba acorde con nuestra tradición procesal. En tiempo de España no existía en nuestro ordenamiento jurídico la institución del jurado. Evidentemente el legislador no estimó prudente imponer una institución foránea y permitió que el acusado lo eligiera, si así lo deseaba.

■ Vigente ya nuestra disposición constitucional que garantiza el juicio por jurado en casos graves, resolvimos que el acusado podía renunciar a ese derecho y que lo podía hacer a través de su abogado. *Pueblo* v. *Santiago*, 78 D.P.R. 69 (1955). Es en las Reglas de Enjuiciamiento Criminal de 1963 que se exige que el acusado deberá renunciar expresa y personalmente a que su caso se vea por jurado.

El derecho a juicio por jurado en los Estados Unidos tiene hondas raíces. Es parte integrante de su ordenamiento jurídico. Interpretando las disposiciones de la Regla 23 (a) ([3])

---

([2]) Dispone el Art. 178 del Código de Enjuiciamiento Criminal:

"Cuestiones de hecho en casos de delito grave y en casos de delito menos grave siempre que originariamente se presentare la acusación en la corte de distrito y fueren también de la competencia de las cortes municipales, habrán de ser juzgadas por el jurado, cuando el acusado o acusados o cualquiera de ellos, lo pidiere. Dicha elección deberá notificarse al tribunal cuando se haga la primera lectura de la lista que contenga la causa. Si se hiciere dicha elección, ésta se hará constar en el récord; si no se hiciere, se hará constar así en dicho récord, y se considerará que el derecho a ser juzgado por jurado ha prescrito y la causa será juzgada por el tribunal. Sin embargo, si se alegan justas razones, el tribunal podrá conceder el juicio por jurado en cualquier fecha subsiguiente a la lectura de la lista o relación de causas."

([3]) Dispone la Regla 23 (a) de las de Procedimiento Criminal Federal que: "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."

de las de Procedimiento Criminal Federal, la Corte Suprema de los Estados Unidos dictaminó en *Singer* v. *United States*, 380 U.S. 24 (1965), luego de hacer una incursión histórica en el desarrollo de la institución del jurado en Inglaterra y en las Colonias que luego formaron la federación, que:

"A la luz de la importancia que da la Constitución al derecho a juicio por jurado nos es difícil comprender cómo el apelante propone escuetamente que el obligar a un acusado a someterse a un juicio por jurado, contra su voluntad, conlleva una violación a su derecho a un juicio justo o al debido procedimiento de ley. El único derecho constitucional que tiene un acusado en relación al método del juicio es el de un juicio por jurado imparcial. No encontramos ningún impedimento constitucional a que se condicione a la aprobación del fiscal y del juez la renuncia de su derecho a juicio por jurado cuando, de negarse alguno de éstos, lo que resulta es, simplemente, que el acusado se habrá de someter a un juicio por jurado imparcial—precisamente lo que la Constitución le garantiza. La Constitución reconoce el sistema de adversarios como el método apropiado para determinar la culpabilidad, y el pueblo, como litigante, tiene un interés legítimo en velar porque aquellos casos en que considera que se justifica una convicción se vean ante el tribunal considerado por la Constitución como aquel que con toda probabilidad producirá un resultado justo."

Ver además, *United States* v. *Abrams*, 357 F.2d 539 (2d Cir. 1966); *State* v. *Taylor*, 391 S.W.2d 835 (Mo. 1965); Notas, 25 Md. L. Rev. 262 (1965); 26 U. Pitt. L. Rev. 867 (1965); Anotaciones 13 L.Ed.2d 1119 (1965); 51 A.L.R.2d 1346 (1957).

La práctica en los estados federados es variada. Algunos requieren el consentimiento de la corte para que pueda renunciarse al jurado. Otros, el del fiscal o el del fiscal y la corte. Hay quien lo considera un derecho del acusado. En Nota que aparece en 51 Cornell L.Q. 339 (1966) se recopilan estos datos con expresión de las disposiciones estatutarias correspondientes.

La decisión del caso de *Singer* se limitó a establecer que las condiciones impuestas por la Regla 23 (a) para que procediera la renuncia—consentimiento previo del tribunal y del fiscal—no infringían las garantías constitucionales. Se ha criticado como demasiado restrictiva y se ha llegado a sugerir que debe enmendarse la Regla 23 (a). Véase Nota en 60 Nw. U. L. Rev. 722 (1965).

La práctica prevaleciente en esta jurisdicción a la fecha en que se celebró el juicio—24 de septiembre de 1962— y la ahora vigente en virtud de lo dispuesto en la Regla 111 de las de Procedimiento Criminal, no obliga a un acusado a que su caso se vea por jurado. Distinto a la tradición imperante en los Estados Unidos, hemos visto que en nuestro medio el juicio por jurado, si bien actualmente es un derecho garantizado constitucionalmente, no es un ingrediente esencial en nuestro procedimiento. Siempre se ha reconocido el derecho del acusado a renunciarlo.

Ahora bien, esa renuncia debe hacerla el acusado antes de comenzar el juicio. En ese momento es un derecho que el acusado tiene y al ejercitarlo debe ser sostenido por el tribunal. Pero la situación es distinta cuando luego de optar porque el caso se vea ante jurado y comenzado el mismo cambie de parecer y opte por renunciar a ello. En ese caso ya se ha movido la maquinaria de la justicia de acuerdo con lo pedido por el acusado, y es discreción de la corte concederlo o no. *Pueblo* v. *Hernández*, 55 D.P.R. 954 (1940) y ver además *Pueblo* v. *Plata*, 43 D.P.R. 464 (1932). En el presente caso el acusado pretendió renunciar al jurado en el momento en que lo hizo, evidentemente influido por las manifestaciones del juez transcritas anteriormente. Las mismas podían interpretarse en el sentido de que el juez favorecía la posición de la defensa. El juez posiblemente entendió que el acusado así lo interpretaba y que inducido por esa interpretación, tal vez equivocada, fue que solicitó que el juicio continuara por tri-

bunal de derecho. El juez actuó prudentemente al denegar lo pedido. Por situaciones como éstas u otras análogas, es que debe ser discrecional del juez que preside un juicio el acceder a que el mismo continúe por tribunal de derecho una vez comenzado a ventilarse ante un jurado.

■ El apelante apunta que no se estableció más allá de duda razonable que el acusado causó la muerte de Félix Báez Franco. Basa su contención en que habiendo demostrado la autopsia que no había fractura del cráneo, esa circunstancia es incompatible con la prueba presentada por el fiscal al efecto de que el occiso fue víctima de tres trancazos que necesariamente tenían que haberle fracturado el cráneo. La prueba de cargo establece que el apelante le propinó dos trancazos en la cabeza a Félix Báez y la autopsia reveló que murió de un severo trauma cráneo-cerebral. El hecho de que no se le ocasionara una fractura del cráneo no tiene relevancia. Así el médico declaró que "Un cerebro puede tener unos hallazgos muy severos, unas lesiones muy extensas sin embargo con un historial de poco trauma, y puede ser al revés, pero claro, las lesiones cerebrales que tenía eran lesiones extensas; y además puedo asegurar que son de origen traumático."

■ Uno de los agentes que investigó el caso al declarar en el juicio hizo referencia a manifestaciones hechas por el acusado cuando se investigaban los hechos. Esas manifestaciones no constituían ni admisiones ni confesiones. (⁴) Eso no

---

(⁴) Las manifestaciones se relacionan con comentarios hechos por el acusado cuando se estaba llevando a cabo la investigación en el barrio. El policía declaró que el acusado le había informado en una ocasión que "él se había acostado a dormir a las ocho de la noche y no se había levantado en toda la noche" y que Félix no había estado en el negocio ese día. En otra ocasión dijo que "estaba durmiendo y me llamaron como a las once de la noche y yo les despaché [se refería a los dos individuos que estaban en la tienda] y ellos se fueron y yo me acosté a dormir y eso es todo lo que sé de este caso." Después que se le informó que estaba acusado de asesinato el detective declaró que el acusado expresó:

"R. . . . lo que yo sé de este caso es que la noche de esos hechos yo me

obstante, el apelante sostiene que pudieron perjudicarle ante el jurado e invoca a *Escobedo* v. *Illinois,* 378 U.S. 478 (1964) y a *Miranda* v. *Arizona,* 384 U.S. 436 (1966). Éstos no son de aplicación a la situación de autos. Además el juicio se celebró el 24 de septiembre de 1962 antes de haberse resuelto *Escobedo* y *Rivera Escuté* v. *Jefe Penitenciaría,* 92 D.P.R. 765 (1965). *Pueblo* v. *Adorno Lorenzana,* 93 D.P.R. 788 (1966).

*Procede confirmar la sentencia apelada.*

El Juez Asociado Señor Santana Becerra hace constar que no emite juicio en este momento en cuanto a una negativa del Tribunal a acceder a la renuncia del jurado, solicitada dicha renuncia al comenzar el juicio.

acosté a dormir y por ahí cerca de la media noche oí una cerda que tengo, que sonaba la cerda . . .

"P. ¿Chillando?

"R. Sí, chillaba la cerda. Se levantó porque creía que se la estaban robando y cuando fue encontró a Pedro y Juan que estaban en la orilla del camino alumbrando con un flashlight que estaba en el piso y que vio eso y fue y se acostó a dormir."